## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MAYA DEVINSKAYA,<br><br>                         Plaintiff,<br><br>           v.<br><br>SERVICE CORPORATION INTERNATIONAL INC., SCI PENNSYLVANIA FUNERAL SERVICES INC., FOREST HILLS CEMETERY CORPORATION, and SHALOM MEMORIAL PARK, INC., each doing business as "SHALOM MEMORIAL PARK,<br><br>                      Defendants. | **Civil Action No. 14-CV-3630 (PD)**<br><br><br><br><br><br><br><br>**FIRST AMENDED COMPLAINT** |

### INTRODUCTION

1.    This is an individual action, brought under Pennsylvania law, on behalf of Plaintiff Maya Devinskaya, who was an intended victim of the outrageous scheme and unlawful conduct alleged herein.

2.    Defendants collectively own and operate "Shalom Memorial Park," a Jewish cemetery located in Philadelphia, Pennsylvania, where Defendants sell burial plots and burial services therein.

3.    As set forth more fully herein, in operating Shalom Memorial Park, Defendants have engaged in a long-standing policy of unlawful acts and omissions in the sale of burial plots , as well as deceptive conduct in Defendants' subsequent performance with regard to those plots after sale.

4.    This uniform course of conduct was the result of intentional and knowing actions and omissions by Defendants, as Defendants tried to increase their profits by knowingly "overselling" grave plots in Shalom Memorial Park. In other words, Defendants engage in a

1

policy of selling more burial plots in Shalom Memorial Park than can physically be derived from the finite amount of land available to place graves.

5.    At all times relevant hereto, Defendants have been fully aware that the inevitable result of such a policy of "overselling" plots is that the boundaries of the "plots" sold by Defendants are regularly penetrated and encroached upon by Defendants, as Defendants attempt to squeeze more and more bodies into that finite amount of space.

6.    Plaintiff Devinskaya was a victim of this policy.

7.    This action seeks redress for Plaintiff Devinskaya in the form of compensatory damages, a statutory penalty of $100 for Plaintiff Devinskaya under 73 P.S. § 201-9.2(a), punitive damages and injunctive relief, which would include, inter alia, an order for injunctive relief regarding Lot 538, grave 4.

## THE PARTIES

8.    Plaintiff Maya Devinskaya is a 73 old widow who resides in Philadelphia, Pennsylvania. Mrs. Devinskaya purchased a burial plot in Shalom Memorial Park from Defendants in 2013, designated by Defendants as Lot 538, grave 4, in which to bury her daughter.

9.    Defendant Service Corporation International ("SCI") is a Texas Corporation with its principal place of business located at 1929 Allen Parkway, Houston, Texas. SCI regularly conducts business and markets its activities in the Commonwealth of Pennsylvania. Together with the other defendants, SCI owns and operates Shalom Memorial Park cemetery. SCI created the policies alleged herein and directed its subsidiaries, including SCI Pennsylvania Funeral Services, Inc., Forest Hills Cemetery Corporation and Shalom Memorial Park, Inc., as well as its

employees and agents, to carry out these policies relating to the sale of burial plots and treatment of graves at Shalom Memorial Park.

10.     Defendant SCI Pennsylvania Funeral Services, Inc. is a wholly owned subsidiary of Defendant SCI, and has its principal place of business located at 1929 Allen Parkway, Houston, Texas. Along with the other defendants, SCI Pennsylvania Funeral Services, Inc. owns and operates the Shalom Memorial Park cemetery. According to the records of the Pennsylvania Department of State, SCI Pennsylvania Funeral Services, Inc. is one of the registered owners of the fictitious business name "Shalom Memorial Park." SCI Pennsylvania Funeral Services, Inc. followed the directives of its parent, Defendant SCI, and implemented the policies alleged herein relating to the sale of burial plots and treatment of graves at Shalom Memorial Park.

11.     Defendant Forest Hill Cemetery Corporation is a wholly owned subsidiary of Defendant SCI, and has its principal place of business located at Pine Road and Byberry Road, PO Box 11539, Philadelphia, Pennsylvania 19116. Along with the other defendants, Forest Hill Cemetery Corporation owns and operates the Shalom Memorial Park cemetery. According to the records of the Pennsylvania Department of State, Forest Hill Cemetery Corporation is one of the registered owners of the fictitious business name "Shalom Memorial Park." Forest Hill Cemetery Corporation followed the directives of its parent, Defendant SCI, and implemented the policies alleged herein relating to the sale of burial plots and treatment of graves at Shalom Memorial Park

12.     Defendant Shalom Memorial Park, Inc. is a Pennsylvania corporation with a registered address of 1635 Market Street, Philadelphia, Pennsylvania, 19103. Along with the other defendants, Shalom Memorial Park, Inc. owns and operates the Shalom Memorial Park cemetery.  Shalom Memorial Park, Inc. followed the directives of its parent, Defendant SCI, and

implemented the policies alleged herein relating to the sale of burial plots and treatment of graves at Shalom Memorial Park.

13.    After reasonable investigation, Plaintiff avers that each of the Defendants acted as the agent, instrumentality and alter ego of the others, with a unity of purpose designed to increase profits based on the sale of burial plots at the Shalom Memorial Park under the policies alleged herein.

14.    At all relevant times, Defendant SCI designed, drafted and implemented the policies and procedures used at Shalom Memorial Park, including the policies alleged herein. Defendant SCI mandated training for employees at Shalom Memorial Park. The contents of such training was created by and emanated from Defendant SCI. Defendant SCI also performed audits on Shalom Memorial Park.

15.    Each Defendant participated in the policies alleged herein, rendering each such Defendant jointly and severally liable for the conduct alleged herein.

16.    Each Defendant held itself out to Plaintiff Devinskaya and the world using the fictitious business name "Shalom Memorial Park," making it impossible for Plaintiff to further differentiate between the actions of the specific Defendants at this time without discovery. Accordingly, all Defendants are henceforth collectively referred to as "Shalom Memorial Park" and/or "Defendants."

<u>VENUE</u>

17.    This matter is properly venued in Philadelphia County in that Plaintiff purchased a burial plot for her daughter Ella---Lot 538, grave 4--- from Defendants in the Shalom Memorial Park in Philadelphia, Pennsylvania and Plaintiff resides in Philadelphia, Pennsylvania.

## FACTS GIVING RISE TO THE CAUSES OF ACTION

18.   Defendant SCI is a publically traded company which describes itself as **"North America's largest single provider of funeral, cremation and cemetery services."**

19.   SCI operates more than 400 cemeteries in 43 states, including over 40 in the Commonwealth of Pennsylvania. Among these is Shalom Memorial Park, a Jewish cemetery in Philadelphia, Pennsylvania.

20.   As claimed by SCI on its own website:

> **"Service Corporation International is dedicated to compassionately supporting families at difficult times, celebrating the significance of lives that have been lived, and preserving memories that transcend generations, with dignity and honor."**

21.   As is clear from the series of lawsuits and criminal investigations by law enforcement officials in various states over the last decade, Defendant SCI operates the cemeteries it owns in ways that make this statement grossly and tragically inaccurate.

22.   In 2001, SCI was sued in a class action in Florida for its operation of the Memorial Gardens cemetery near Fort Lauderdale, Florida, in an action captioned <u>Joan Light v. SCI Funeral Services</u>, 17th Judicial Circuit, in and for Broward County, Florida, Case No. 01-21376 08.

23.   As alleged in the <u>Light</u> matter, SCI had oversold the cemetery, so bodies were buried too close together, causing the graves to "encroach" on one another; in many cases overlapping each other.

24.   In an effort to hide this fact, SCI pursued a policy of secret exhumation, in which bodies were exhumed and re-buried, without notice to authorities or family members.

25.   These allegations were particularly appalling to the Jewish cemetery's more

religiously observant customers, since traditional Jewish law requires bodies to be buried intact and prohibits disturbing the dead.

26.    Moreover, in cases where exhumation and re-burial is necessary, Jewish law requires a religious service be performed prior to re-internment; something which could not be done owing to SCI's policy of failing to notify family members that their loved one was being moved.

27.    SCI reached a $14 million agreement with the Florida Attorney General's Office in 2003 that required SCI to repair plots and reorganize the cemeteries to ensure all graves were properly marked and the grounds could accommodate all plots sold.

28.    SCI also settled a separate class-action lawsuit in Florida on behalf of 350 families for another $100 million.

29.    In 2009, SCI was again sued in a class action relating to its operation of a Jewish cemetery in Mission Hills, California, in an action captioned Sands v. SCI, Superior Court of the State of California, County of Los Angeles, Case No. BC421528.

30.    Again, SCI was alleged to have "oversold" the cemetery, and to have engaged in a systematic policy of destroying or moving older graves in order to make room for new ones, without notifying authorities or family members.

31.    After the California Supreme Court affirmed  certification of a class action, SCI eventually settled Sands for $80 million.

32.    In 2010, an SCI-owned Jewish funeral home in Brookline, Massachusetts was charged by the Massachusetts State Board of Registration with serious violations of state law and regulations in connection with an incident where a woman was buried in the wrong grave, then disinterred without a legal permit being obtained and reburied in the correct grave, with the

6

woman's family not being notified of the mistake or the corrective procedure. As a result, in December 2011, the State Board announced a Consent Agreement and levied the biggest fine in its history against SCI.

33.    Unfortunately, neither these prior incidents, nor the penalties and costs imposed as a result of these incidents have caused Defendants to live up to their promise to consumers of treating the deceased with "dignity and honor."

34.    Rather, the same policies and course of conduct present in these prior incidents exist at Shalom Memorial Park, a Jewish cemetery owned and operated by Defendants in Philadelphia, Pennsylvania.

35.    Specifically, as in these prior incidents, Defendants have "oversold" Shalom Memorial Park, pursuing a conscious and knowing policy of selling more burial plots than the amount of land available for burial can physically accommodate.

36.    As in these prior incidents, this policy has led Defendants to try to squeeze in new burials in areas which are already saturated with existing graves, with the inevitable and foreseeable result that Defendants encroach on existing graves, violating the boundaries of plots that have already been sold and are occupied.

37.    This course of conduct consists of a series of related acts and omissions by Defendants, under which Defendants:

> a.  Knowingly sold more burial plots than Defendants had land available to actually place graves without overlapping;
>
> b.  Knowingly pursued a policy of "encroachment," under which bodies in what were represented to be separate grave plots were intentionally placed by Defendants so close together that the bodies actually overlapped, touched or very nearly touched, one another;
>
> c.  Intentionally sold plots which Defendants knew were subject to this policy of "encroachment," without revealing the existence of this policy to the purchasers;

7

    d.   Knowingly buried bodies in plots which were already occupied by other bodies or in which two bodies partially overlapped; and

    e.   Intentionally sold plots to new purchasers which Defendants were aware were already occupied by a body, or where two bodies partially overlapped, without revealing such occupancy to the new purchaser.

38.    These events cannot accurately be described as accidents.

39.    Rather, they are the logical and inevitable outcome of Defendants' knowing and deliberate policy of selling more burial plots than the available land will accommodate.

40.    Indeed, employees of Defendant SCI have reported that there is a conscious and deliberate policy at Shalom Memorial Park, in which graves are watched by Defendants to see which ones are seldom or never visited by loved ones. Those which Defendants deem are unlikely to be visited are then targeted by Defendants for "encroachment," with the idea being that no one is likely to complain if Defendants violate the boundaries of such existing older plots in order to squeeze in new graves.

41.    For obvious reasons, Defendants did not reveal the existence of such policies to Plaintiff Devinskaya when she purchased a grave plot at Shalom Memorial Park from Defendants for her daughter Ella.

42.    Rather, Defendants took full advantage of the fact that Jewish law dictates a prompt funeral and burial, leaving Plaintiff Devinskaya with little time to shop around.

43.    Defendants never advised Plaintiff Devinskaya that Defendants would breach the boundaries of Lot 538, grave 4 in order to squeeze in other graves. Nor was she notified of any of the facts set forth above relating to Defendants' policy of "encroachment" or any of the other related policies described herein.

44.   Rather, in 2013, Plaintiff Maya Devinskaya was a 73 year old widow living on Social Security who was still trying to recover from the loss of her beloved husband when she suffered one of the worst tragedies that can befall a parent.

45.   Her 42 year old daughter, Ella, had died unexpectedly.

46.   Neither Ella's estate nor Mrs. Devinskaya had the money to purchase a burial plot for Ella.

47.   Defendants refused to finance the sale of a burial plot for Ella, citing a policy that Defendants only allow financing "pre-need" and will not finance a grave that is to be immediately occupied.

48.   Because Jewish law required a prompt burial for Ella, Plaintiff Devinskaya was pressed for time, a fact of which Defendants were aware and of which they took full advantage.

49. Defendants agreed to sell Lot 538, grave 4 at Shalom Memorial Park to Plaintiff Devinskaya for her deceased daughter by "trading" a different plot Plaintiff Devinskaya already owned outright in Shalom Memorial Park back to Defendants – a plot next to her late husband where she herself intended to be buried .

50.   Plaintiff Devinskaya gave up her ownership of that plot and in return Defendants represented that Plaintiff Devinskaya was now the legal owner of Lot 538, grave 4.

51.   Ella was then buried in June of 2013 in Lot 538, grave 4.

52.   After Ella was buried, her husband, brother, mother and other family members visited Lot 538, grave 4 frequently, including all Jewish holidays.

53.   By winter, the family began to notice that when they walked around Ella's grave at Lot 538, grave 4, the ground was sinking.

54.    In late March of 2014, Plaintiff Devinskaya, along with Ella's husband and other family members, visited Ella's gravesite at Lot 538, grave 4, in order to measure the site for a gravestone.

55.    The plan was to purchase a gravestone and then have relatives from all over the United States and the World to come to the cemetery for a ceremony to place the stone.

56.    Relatives as far away as Ukraine and Australia purchased tickets to attend this ceremony in June 2014, the anniversary of Ella's death.

57.    While they were at the gravesite in March of 2014, Plaintiff Devinskaya tripped in a spot where the soil was sinking.

58.    Plaintiff Devinskaya and other family members went to the cemetery office to complain to Defendants' management.

59.    They met with a male manager who then accompanied them to the gravesite at  Lot 538, grave 4.

60.    While they were at the grave, they explained that they were there that day to measure for a headstone for Ella.

61.    The manager began to claim that they were in the wrong spot, that Ella's head was not where Plaintiff Devinskaya and her family were measuring, but approximately a meter away.

62.    Plaintiff Devinskaya knew this was not true.

63.    At least one family member had visited Ella's grave almost every day since the funeral and they were certain of the correct location of Lot 538, grave 4.

64.    The manager continued to insist that Ella was in a different location.

65.    When the family contradicted him, the manager then became agitated and appeared uncomfortable.

10

66.   He left without the issue being resolved.

67.   Approximately two weeks later, a man named Yakov contacted Plaintiff Devinskaya's family and said he had been hired by the family of an individual named Emil Khrizman to place a gravestone on Mr. Khrizman's grave at Shalom Memorial Park.

68.   Yakov is in the business of selling and installing headstones and does a substantial amount of work at the Shalom Memorial Park.

69.   Yakov said that when he went to the cemetery to place the headstone on Mr. Khrizman's grave, he found the site was occupied by Ella's photograph and flowers.

70.   Yakov immediately brought this to the attention of the Khrizman family and they in turn immediately complained to Defendants' management.

71.   Defendants' management then called Plaintiff Devinskaya at home and admitted that there was a problem with Ella's grave at Lot 538, grave 4.

72.   Defendants' management indicated that there was another family who wanted to put a monument on a deceased family member's gravesite and that there was not enough room to do so unless Ella was disinterred and moved.

73.   Defendants' management demanded that Plaintiff Devinskaya come to Shalom Memorial Park and sign a consent form allowing Defendants to disinter Ella's body and re-bury it in another location.

74.   Plaintiff Devinskaya was devastated and has suffered severe emotional distress.

75.   Ella's husband, who had already suffered from high blood pressure, had to immediately seek medical attention in the hospital due to the stress from this issue.

76.   Subsequent investigation revealed the horrible truth.

77.   Defendants had buried Ella in a burial plot which already contained the remains of Mr. Khrizman.

78.   In other words, Defendants had sold Plaintiff Devinskaya a burial plot for Ella which overlapped with a plot Defendants had previously sold to the Khrizman family and then Defendants buried Ella in a manner in which the two bodies overlapped!

79.   Defendants have obviously known this from the beginning.

80.   But for Yakov Natanzon's observations, and the daily observations of Ella's family as to the location of Ella's grave, this fact would never have been made known to Plaintiff Devinskaya.

81.   As ghastly and egregious as Defendants' policies are, they are especially harmful in that Shalom Memorial Park is a Jewish cemetery and Jewish law generally forbids disinterment and, even where it is allowed, requires a new religious ceremony to be performed upon disinterment and re-burial.

82.   Plaintiff Devinskaya has been damaged by these policies and is entitled to compensatory, punitive and statutory damages, as well as injunctive relief and damages for emotional distress.


## COUNT I

### Pennsylvania Unfair Trade Practices and Consumer Protection Law
### 73 Pa. Cons.St. § 201–1 et. seq.

83.   Plaintiff incorporates all preceding paragraphs of this complaint as if set forth fully herein.

84.   This action does not raise any claims of common law fraud.

85.   Rather, the claims in this count arise exclusively against Defendants under the

UTPCPL.

86.   **"The purpose of the UTPCPL is to protect the public from fraud and unfair or deceptive business practices."** Keller v. Volkswagen of Am., Inc., 733 A.2d 642, 646 (Pa.Super.1999).

87.   It is well-established that, in order to carry out that purpose, the UTPCPL must be liberally construed. See Chiles v. Ameriquest Mortg. Co., 551 F.Supp.2d 393, 398 (E.D.Pa.2008) (**"The UTPCPL must be construed liberally."**); Pirozzi v. Penske Olds-Cadillac-GMC, Inc., 413 Pa.Super. 308, 605 A.2d 373, 376, appeal denied, 532 Pa. 665, 616 A.2d 985 (1992) (**"our supreme court held that the UTPCPL is to be liberally construed in order to effect its purpose."**)

88.   In order to prevail under the UTPCPL, a plaintiff must prove the transaction between plaintiff and defendant constituted "trade or commerce" within the meaning of the UTPCPL and that the defendant was engaged in unfair or deceptive acts or practices.

89.   The conduct alleged herein clearly took place during "trade and commerce" within the meaning of the UTPCPL in that Defendants are selling burial plots and burial services to the public.

90.   The conduct alleged herein constitutes a deceptive practice.

91.   The UTPCPL 73 P.S. § 201-2(4)(xxi) defines unfair or deceptive acts or practices, inter alia, as any: **"deceptive conduct which creates a likelihood of confusion or misunderstanding."**

92.   Prior to 1996, 73 P.S. § 201-2(4)(xxi) required that a defendant engage in the equivalent of common law fraud. See Flores v. Shapiro & Kreisman, 246 F.Supp.2d 427, 432 (E.D.Pa.2002); Commonwealth of Pa. v. Percudani, 825 A.2d 743, 746-47 (Pa.Commw.2003).

93.    In 1996, however, UTPCPL 73 P.S. § 201-2(4)(xxi) was amended to add the word "deceptive conduct" as an alternative to "fraud" in describing the practices prohibited by this section. See Grimes v. Enter. Leasing Co. of Phila., LLC, 66 A.3d 330, 337 at n.4 (Pa. Super. Ct. 2013)(holding that reliance was not an element of a claim under the UTPCPL for a deceptive conduct "catchall" violation); Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC, 40 A.3d 145 (Pa.Super.2012) (holding that the amendment to the catch-all provision that added the language "or deceptive conduct" changed the requirement from proving actual fraud to merely proving deceptive conduct); Commonwealth of Pa. v. Percudani, 825 A.2d 743, 746-47 (Pa.Commw.2003) (a plaintiff who alleges deceptive conduct to proceed without proving all of the elements of common law fraud); Flores v. Shapiro & Kreisman, 246 F.Supp.2d 427, 432 (E.D.Pa.2002):

> **"by adding a prohibition on 'deceptive' conduct, the 1996 amendment to the CPL eliminated the need to plead all of the elements of common law fraud in actions under the CPL. Under general principles of statutory interpretation, no word should be rendered redundant. The new word "deceptive" in the statute, therefore, must have been intended to cover conduct other than fraud."**

94.    Numerous cases have held that, after 1996, 73 P.S. § 201-2(4)(xxi) does not require actual fraud or reliance, including several recent Superior Court opinions. See Grimes v. Enter. Leasing Co. of Phila., LLC, 66 A.3d 330, 337 at n.4 (Pa. Super. Ct. 2013), holding that reliance was not an element of a claim under the UTPCPL for a deceptive conduct "catchall" violation stating:

> **"As this Court recently held in Bennett, when a plaintiff alleges a claim under the UTPCPL catchall provision under the theory of deceptive conduct, the plaintiff need not prove the elements of common law fraud, including 'induc[ment of] justifiable reliance ....' Bennett, supra at 152 n.5, 154-155. Therefore, to the extent that Grimes alleges Enterprise's conduct was deceptive, as opposed to fraudulent, she need not allege justifiable reliance."(emphasis added)**

14

See also Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC, 40 A.3d 145 (Pa.Super.2012) (holding that the amendment to the catch-all provision that added the language "or deceptive conduct" changed the requirement from proving actual fraud to merely proving deceptive conduct).

95.   As alleged herein, Defendants have engaged in deceptive conduct which creates a likelihood of confusion or misunderstanding.

96.   The practices of Defendants as alleged herein are clearly deceptive and, indeed, are outrageous and shocking.

97.   Such conduct is also based on, inter alia, material nondisclosures and material omissions of facts known by Defendants.

98.   At no point in the process of selling Lot 538, grave 4 to Plaintiff did Defendants inform Plaintiff Devinskaya in any fashion of the following material facts of which Defendants were aware:

    a.   That Defendants employ a policy of "double selling" the same grave plot to multiple purchasers;

    b.   That Defendants have sold more grave plots in Shalom Memorial Park than there is physical space to accommodate such graves without overlapping;

    c.   That Defendants are pursuing a policy of "encroachment" as described herein;

    d.   That Defendants' policies result in bodies touching or overlapping; and

    e.   That Defendants' policies may require disinterment and re-burial of loved ones.

99.   Plaintiff reasonably and justifiably expected that Defendants would not engage in the activities outlined above.

100.  It is submitted that the Court may presume as a matter of law that no rational consumer would purchase a grave plot from Defendants if they were made aware of the omitted facts outlined above. See Markocki v. Old Republic Nat'l Title Ins. Co., 254 F.R.D. 242, 251 (E.D. Pa. 2008).

101.  As a proximate result of Defendants' conduct, Plaintiff has suffered an ascertainable loss of money and property.

102.  Specifically, by the acts alleged herein, Plaintiff has been deprived of the use, benefit and value of the grave, Lot 538, grave 4, which she purchased from Defendants for her daughter's burial.

103.  In addition, because of Defendants' conduct, Plaintiff will be forced to pay additional monies for religious ceremonies required by Jewish law for disinterment and reburial of her daughter Ella.

### COUNT II

### Unjust Enrichment/Disgorgement

104.  Plaintiff incorporates all preceding paragraphs as though fully set forth at length herein.

105.  Alternatively, by the acts alleged herein, Defendants received a benefit from Plaintiff in exchange for Ella's grave at Lot 538, grave 4.

106.  The retention of that benefit by Defendants would be unjust because of the circumstances described herein.

107.  By the facts alleged herein, equity demands that Defendants disgorge themselves of this benefit and that the benefit be returned to Plaintiff.

108.  Thus, as an alternative theory, Plaintiff brings this claim of unjust enrichment/

disgorgement.

## COUNT III

### Breach of Contract

109.  Plaintiff incorporates all preceding paragraphs as though fully set forth at length herein.

110.  Defendants told Plaintiff at the time she purchased Ella's burial plot at  Lot 538, grave 4, that she would be the full, lawful and exclusive owner of Lot 538, grave 4.

111.  Plaintiff  does not recall Defendants presenting Plaintiff with any documents relating to the sale of Lot 538, grave 4, other than a document labeled "quitclaim" which may---or may not—be found to be a valid express contract.

112.  Accordingly, as an alternative theory of liability, Plaintiff alleges that an express or implied contract exists between Defendants and Plaintiff relating to her purchase of Lot 538, grave 4.

113.  By the acts alleged herein, Defendants have breached that contract.

114.  Moreover, every contract contains within it an implied covenant of good faith and fair dealing.

115.  By the acts alleged herein, Defendants have breached that covenant of good faith and fair dealing in the most outrageous way imaginable.

116. As a result of that breach, Plaintiff has suffered damages.

## COUNT IV

## TRESPASS

117.  Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

118.  By the acts set forth herein, Defendants have committed volitional acts of intrusion on property owned by Plaintiff; i.e. the grave plot sold to Plaintiff for burial of her daughter Ella at Lot 538, grave 4.

119.   These acts of intrusion included breaching the boundaries of Lot 538, grave 4, by inter alia, placing another body or a portion of a body within the boundaries of Lot 538, grave 4, and selling, or purporting to sell, all or a portion of Lot 538, grave 4 to other buyers.

120.  These intrusions were committed by Defendants without the permission of Plaintiff.

121.   Plaintiff was in possession of Lot 538, grave 4, and/or was entitled to possession, at the time these intrusions occurred.

122.  Defendants acted with the knowledge and the intent of intruding on property owned by Plaintiff.

## COUNT V

## PRIVATE NUISANCE

123.  Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

124.  By the acts set forth herein, Plaintiff owned and/or had legal control over certain property; i.e. Lot 538, grave 4.

125.  By the acts set forth herein, Defendants created a condition or permitted a condition to exist that was indecent or offensive to the senses, and was an obstruction to the free use of this property, so as to interfere with the comfortable enjoyment of that property.

126. This condition interfered with the use or enjoyment of land owned by Plaintiff.

127. Plaintiff did not consent to Defendants' conduct.

128. An ordinary person would be reasonably annoyed or disturbed by Defendants' conduct.

129. Plaintiff was harmed by that conduct.

130. Defendants' conduct was a substantial factor in causing that harm.

131. The seriousness of the harm outweighs the public benefit of Defendants' conduct.

## COUNT VI

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

132. Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

133. Defendants' conduct, as described herein was:

    a. extreme and outrageous; and

    b. intentional and/or reckless; and

    c. caused severe emotional distress to Plaintiff Devinskaya.

134. Defendants' conduct was beyond all possible bounds of decency, atrocious, and utterly intolerable in a civilized community.

135. In addition, there is a special relationship between Defendants and Plaintiff Devinskaya in that Defendants held themselves out to Plaintiff as providing a dignified and serene location for the final resting place for Plaintiff's daughter, in a manner fully consistent with the practice of the Jewish faith.

136. Accordingly, Defendants knew that the conduct of Defendants violated

19

several prohibitions under Jewish law relating to burial or unrelated bodies in a common grave, disinterment and reburial, and was likely to cause extreme emotional distress.

## COUNT VII

## TORTIOUS INTERFERENCE WITH A DEAD BODY

137.   Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

138.   By the acts alleged herein, Defendants have wantonly mistreated the body of a dead person within the meaning of Restatement (Second) of Torts § 868 (1977).

139.   Plaintiff is a person entitled to the disposition of that body.

140.   Defendants' conduct was intentional, wanton and outrageous.

**WHEREFORE, Plaintiff asks this Court to:**

a.   Enter an order for injunctive and declaratory relief in favor of Plaintiff Devinskaya, mitigating the effects of the policies as alleged herein vis-à-vis Plaintiff Devinskaya, including that all steps required by the Jewish faith be observed and respected by Defendants in any proposed disinterment and reburial of Plaintiff's daughter Ella, and that any costs of reburial---including the cost of any religious ceremony required by Jewish law which is associated with any disinterment and reburial, be borne solely by Defendants;

b.   Enter judgment in favor of Plaintiff Devinskaya as a result of the conduct alleged herein, to include interest and pre-judgment interest;

c.   Award compensatory damages, damages for emotional distress and punitive damages;

d.   Award Plaintiff reasonable attorneys' fees and costs;

e.   Award Plaintiff Devinskaya treble damages and/or a $100 statutory penalty as provided by 73 P.S. § 201-9.2(a); and

f.  Grant such other and further legal and equitable relief as the Court deem just and equitable.

DENITTIS OSEFCHEN, P.C.

BY: _____

Shane T. Prince, Esquire
Stephen P. DeNittis, Esquire
DeNITTIS OSEFCHEN, P.C.
1500 JFK Blvd, Suite 200
Two Penn Center
Philadelphia, PA 19102

Dated: 7/23/14

Gavin Lentz, Esquire
Bryan R. Lentz, Esquire
Bochetto & Lentz, P.C.
1524 Locust Street
Philadelphia, PA 19102

Attorneys for Plaintiffs

<u>VERIFICATION</u>

I, Maya Devinskaya, hereby state:

1. I am the Plaintiff in the within matter.

2. I verify that the statements made in the foregoing complaint are true and correct to the best of my knowledge, information and belief.

3. I understand that the statements in said complaint are made subject to the penalties of 18 Pa. C.S. Section 4904 relating to unsworn falsification to authorities.

_____
Maya Devinskaya

## VERIFICATION

I, Stephen P. DeNittis, hereby state:

1. I am the attorney for the Plaintiffs in the within matter.

2. I verify that the statements made in the foregoing Complaint are true and correct to the best of my knowledge, information and belief.

3. I understand that the statements in said Complaint are made subject to the penalties of 18 Pa. C.S. § 4904 relating to unsworn falsification to authorities.

_____
Stephen P. DeNittis

Dated: 5|12|14

28

Case ID: 140501110

### VERIFICATION

I, Shane T. Prince, hereby state:

4.  I am the attorney for the Plaintiffs in the within matter.

5.  I verify that the statements made in the foregoing Complaint are true and correct to the best of my knowledge, information and belief.

6.  I understand that the statements in said Complaint are made subject to the penalties of 18 Pa. C.S. § 4904 relating to unsworn falsification to authorities.

_____
Shane T. Prince

Dated: 5/12-/14

Case ID: 14050111C

# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MAYA DEVINSKAYA, on behalf of herself and all others similarly situated, | Civil Action No. 14-CV-3630-PD |
| Plaintiff, | **CLASS ACTION** |
| v. | |
| SERVICE CORPORATION INTERNATIONAL INC., SCI PENNSYLVANIA FUNERAL SERVICES INC., FOREST HILLS CEMETERY CORP., and SHALOM MEMORIAL PARK, INC., each doing business as "SHALOM MEMORIAL PARK," | |
| Defendants | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of plaintiff's First Amended Complaint were

served upon the following counsel for defendants via hand delivery:

John F. Stoviak, Esquire
Nicholas J. Nastasi, Esquire
Saul Ewing, LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186

Attorney for Defendants

Dated:  July 23, 2014

Shane T. Prince, Esq.